207 P.3d 725

**David LAKE, Plaintiff/Appellant,**

**v.**

**CITY OF PHOENIX, a political subdivision of the State of Arizona; Frank Fairbanks, in his official capacity; Mario Paniagua, in his official capacity; Jack Harris, in his official capacity, Defendants/Appellees.**

**No. 1 CA–CV 07–0415.**

Court of Appeals of Arizona, Division 1, Department C.

Jan. 13, 2009.

---

Yen Pilch Komadina & Fleming, P.C. By Caroline A. Pilch, Neil Landeen, Phoenix, Attorneys for Plaintiff/Appellant.

Gary Verburg, Office of the City Attorney By Sandra Hunter, Assistant City Attorney, Phoenix, Attorneys for Defendants/Appellees.

## OPINION

BROWN, Judge.

¶ 1 David Lake appeals the superior court's order in favor of the City of Phoenix, in Lake's statutory special action to compel the City to produce documents pursuant to Arizona's public records law, Arizona Revised Statutes ("A.R.S.") sections 39–121 to –121.03 (2001 and Supp.2008).[1] For the following reasons, we affirm the superior court's order in part, reverse in part, and remand for further proceedings.

## BACKGROUND

¶ 2 From March 2006 through November 2006, Phoenix Police Officer Lake submitted a series of public records requests to the City. In December 2006, he filed a special action in the superior court, alleging the City failed to produce the records responsive to several of his requests and intentionally delayed production of other records. He also alleged that the City intentionally withheld

public records because he had filed an Equal Employment Opportunity Complaint against the City as well as a notice of claim. Lake requested an order compelling the City to promptly disclose all pertinent records and further requested his attorneys' fees and costs incurred in bringing the special action, as well as double damages pursuant to A.R.S. § 12–349 (2003). In response, the City admitted the court had jurisdiction to consider Lake's special action but denied he had been wrongfully deprived of access to public records.

¶ 3 The superior court held a status conference and ordered the parties to brief the issues. After reviewing the parties' memoranda and hearing oral argument, the court denied jurisdiction and determined that Lake was not entitled to the relief he had requested in his petition for special action. Lake timely appealed.

## DISCUSSION

### A. Jurisdiction

¶ 4 As an initial matter, we address the superior court's ruling that it "denied jurisdiction" of Lake's special action. Lake argues that the court did not reach the merits of his action but denied him relief because it erroneously concluded that it lacked jurisdiction to hear the matter. The court's jurisdiction was not discretionary because A.R.S. § 39–121.02(A) provides that any person who has been denied access to public records may challenge the denial through a special action in the superior court. We conclude that the court had jurisdiction to determine this matter and in fact exercised its jurisdiction by considering the merits of Lake's claim and denying relief.

### B. Public Records Requests

#### 1. Wrongful Denial of Access

¶ 5 Lake contends that the City wrongfully refused to produce public records responsive to four of his eighteen public records requests.[2] The City responds that the records

---

1. Other defendants named in the special action were Frank Fairbanks, Mario Paniagua, and Jack Harris, in their official capacities as employees of the City. We refer to all defendants collectively as "the City."

2. We focus here only on the four specific requests discussed by Lake in his opening brief.

it did not produce either do not exist or are not public records as defined by Arizona law.

■ ¶ 6 Whether the City wrongfully denied Lake access to public records is a question of law we review de novo. *See Cox Ariz. Publ'ns, Inc. v. Collins,* 175 Ariz. 11, 14, 852 P.2d 1194, 1198 (1993); *Bolm v. Custodian of Records of the Tucson Police Dep't,* 193 Ariz. 35, 38, ¶ 7, 969 P.2d 200, 203 (App.1998). A denial of access to public records is deemed wrongful if the person requesting the records was, in fact, entitled to them. *Cox,* 175 Ariz. at 14, 852 P.2d at 1198. We examine each of the disputed requests to determine whether Lake was wrongfully denied access to public records.

### a. The Conrad Metadata Request

■ ¶ 7 On March 24, 2006, Lake requested all notes kept by seven named lieutenants, including Lieutenant Robert Conrad, "documenting supervisory performance" between January 1, 2005 and January 1, 2006. Upon receipt of Conrad's notes, Lake suspected the notes were back-dated. In November, 2006, Lake requested the "metadata," or "specific file information contained inside the file" relating to Conrad's notes, including the "[t]rue creation date, the access date, the access dates for each time [the file] was accessed, including who accessed the file as well as print dates, etc." The City denied the request on the basis that Lake asked for a record that was not maintained by the City and was not available. The City also defended its position on the grounds that metadata is not a public record pursuant to *Mathews v.*

*Pyle,* 75 Ariz. 76, 78–79, 251 P.2d 893, 895 (1952).

¶ 8 An electronic document typically contains information that is not revealed when a document is printed. This additional information is called "metadata" and "includes all the contextual, processing, and use information needed to identify and certify the scope, authenticity, and integrity of active or archival electronic information or records."[3] The Sedona Conference, *The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age,* at 80 (2005), *available at* http://www.thesedonaconference.org/content/miscFiles/TSG9_05.pdf.[4]

¶ 9 "Metadata is used for a variety of purposes to enhance the editing, viewing, filing, and retrieval of Office documents." Microsoft Corp., *How to Minimize Metadata in Word 2003,* http://support.microsoft.com/kb/825576 (last visited Dec. 12, 2008). "Some metadata is easily accessible through the Word interface. Other metadata is only accessible through extraordinary means, such as by opening a document in a low-level binary file editor." *Id.* Examples of metadata that may be included in a computer document include: the user's name and initials, the company or organization name, the name of the computer, the name of the network server or hard disk where the document is saved, other file properties or summary information, non-visible portions of embedded or linked objects, document revisions, document versions, template informa-

Although Lake suggests that the City wrongfully denied him access to additional public records, we decline his invitation to review the entire superior court record to make such a determination. *See* ARCAP 13(a)(6) (argument must contain supporting reasons with citations to authorities and relevant parts of the record); *In re One (1) Rolex Brand Man's Watch,* 176 Ariz. 294, 299, 860 P.2d 1347, 1352 (App.1993) ("[I]t is not incumbent upon this Court to develop a party's argument where the party has failed to do so."); *Hubbs v. Costello,* 22 Ariz.App. 498, 501, 528 P.2d 1257, 1260 (1974) (court of appeals was not obliged to search the trial court record to determine if evidence supported appellants' position). Similarly, because Lake fails to develop his argument that the superior court should have awarded him double damages pursuant to A.R.S. § 12–349, we do not address it.

3. "Metadata" is not defined in standard English dictionaries, but other sources generally describe the term as "data about data," or more specifically, "information describing the history, tracking, or management of an electronic document." *O'Neill v. City of Shoreline,* 145 Wash.App. 913, 187 P.3d 822, 824 (2008) (citing *Williams v. Sprint/United Mgmt. Co.,* 230 F.R.D. 640, 646 (D.Kan.2005) (discussing the evolving state of the law concerning discovery of electronic documents and associated metadata in litigation)).

4. The Sedona Conference is a research and educational institute "dedicated to the advancement of law and policy in the areas of antitrust law, complex litigation and intellectual property rights." *Id.* at 106.

tion, hidden text, and comments. *Id.* Metadata concepts were described in a recent ethics opinion addressing the duties of lawyers who send and receive electronic communications:

Such communications may contain metadata. Metadata is information describing the document's history, tracking, and management. Metadata may also include hidden information, such as track changes, comments, and other information. By "mining" the metadata in a document, it may be possible to identify the author of the document, the changes made to the document during the various stages of its preparation and revision, comments made by the persons who prepared or reviewed the document, and other documents embedded within the document.

State Bar of Ariz. Ethics Op. No. 07–03 (Nov.2007), *available at* http://www.myazbar. org/Ethics/opinionview.cfm?id=695. on these general descriptions of metadata, we turn to whether Lake's request falls within the definition of a public record.

¶ 10 Lake argues that the City wrongfully refused to provide the metadata on Conrad's notes, suggesting that the City's motive was improper. According to Lake, he reported serious police misconduct resulting in retaliation by his superiors, including Conrad, which ultimately led to Lake's demotion. Conrad eventually produced his supervisory notes. The hard-copy of the notes indicated they were authored prior to Lake's demotion. Lake asserts that the hard-copy is essentially useless, as Conrad could have easily backdated the notes.[5] Lake further contends that "[w]ithout the metadata, the public has no way of authenticating Conrad's notes to monitor the machinations of government" and that the metadata is necessary to determine if the government was "acting in a lawful and honest manner." Finally, Lake asserts that the City has "chosen to operate in a cloak of secrecy" that undermines the policy behind Arizona's public records law.

¶ 11 It is undisputed that Arizona has a strong policy of public access to and disclosure of public records. *See Griffis v. Pinal County,* 215 Ariz. 1, 5, ¶ 16, 156 P.3d 418, 422 (2007). "Arizona law defines 'public records' broadly and creates a presumption requiring the disclosure of public documents." *Id.* at ¶ 8. Nevertheless, the broad definition of "public record" is not unlimited and the presumption requiring disclosure arises only *after* a determination has been made that a certain record constitutes a public record. *Id.* at 4–5, ¶¶ 10–12, 156 P.3d at 421–22. Thus, determining whether the public records law requires disclosure of a particular record involves a two-step process:

When the facts of a particular case raise a substantial question as to the threshold determination of whether the document is subject to the statute, the court must first determine whether that document is a public record. If a document falls within the scope of the public records statute, then the presumption favoring disclosure applies and, when necessary, the court can perform a balancing test to determine whether privacy, confidentiality, or the best interests of the state outweigh the policy in favor of disclosure.

*Id.* at ¶ 13 (internal quotations and citations omitted).

¶ 12 Although our legislature has not defined the term "public record," Arizona courts have long recognized the following three alternative definitions: (1) a record "made by a public officer in pursuance of a duty, the immediate purpose of which is to disseminate information to the public, or to serve as a memorial of official transactions for public reference"; (2) a record "required to be kept, or necessary to be kept in the discharge of a duty imposed by law or directed by law to serve as a memorial and evidence of something written, said or done"; or (3) a "written record of transactions of a public officer in his office, which is a conve-

---

5. The reasons behind a particular public record request are irrelevant to whether the document must be disclosed. *Phoenix New Times, L.L.C. v. Arpaio,* 217 Ariz. 533, 544, ¶ 38, 177 P.3d 275, 286 (App.2008) (noting the well-established principle "that the requestor's need, good faith, or purpose is entirely irrelevant to the disclosure of public records.") Here, we refer to Lake's reasons for requesting the metadata to provide proper context for his request and to evaluate the nature and purpose of the metadata.

nient and appropriate method of discharging his duties, and is kept by him as such, whether required by ... law or not." *Salt River Pima–Maricopa Indian Cmty. v. Rogers,* 168 Ariz. 531, 538–39, 815 P.2d 900, 907–08 (1991) (quoting *Mathews,* 75 Ariz. at 78, 251 P.2d at 895).[6] Additionally, we look to the "nature and purpose" of the document to determine its status as a public record because "mere possession of a document by a public officer or agency does not make that document a public record ...." *Griffis,* 215 Ariz. at 4, ¶ 11, 156 P.3d at 421; *see also Salt River,* 168 Ariz. at 538, 815 P.2d at 907 ("Not every document which comes into the possession or custody of a public official is a public record.") (citation omitted). Applying these principles to the limited record before us, we conclude that the metadata described in Lake's request does not constitute a public record.

¶ 13 The first definition from *Mathews* does not apply here because the record requested, the metadata, was not made by Conrad in "pursuance of a duty." *See Mathews,* 75 Ariz. at 78, 251 P.2d at 895. Although Conrad may have created his notes pursuant to his duty as Lake's supervisor, he did not create the metadata pursuant to any such duty, as it was generated only as a byproduct of his use of a computer. Additionally, the purpose of the metadata was not to "disseminate information to the public" or "to serve as a memorial of an official transaction for public reference." *See id.*

¶ 14 Similarly, the metadata does not qualify under the second definition. Conrad was not "required by law" to create or maintain

metadata about his notes nor was he required to create or maintain such data "to serve as a memorial and evidence of something written, said or done." *See id.* In other words, Conrad's obligations, if any, to provide written documentation of Lake's performance, consisted of memorializing his notes, whether by computer or other medium. He was not legally obligated to make a record of the filename, to record the name of the computer on which the document was created, to identify the server he may have accessed, to note when the file was accessed or modified, or to identify when it was printed.

¶ 15 We also find that the metadata does not fall within the scope of the third definition from *Mathews,* although it does create a closer question than the initial two definitions. Lake argues that metadata is a written record of a transaction. We are in general agreement with this point because there is no question that metadata includes information reflecting certain transactions that occur in connection with the use of a computer. The transaction recorded by Conrad, however, was not the metadata created by the computer.[7] Rather, the transaction he recorded was his supervisory notes relating to Lake. The nature and purpose of the metadata relating to Conrad's notes were to facilitate preparation of the notes. Through the assistance of a computer, he recorded his recollection of certain events relating to Lake's performance as a police officer.

¶ 16 Lake further argues that metadata contains valuable information that is unavail-

---

6. Lake contends that the "technical analysis" of *Mathews* has been replaced by subsequent appellate decisions, including *Carlson v. Pima County,* 141 Ariz. 487, 687 P.2d 1242 (1984), and *Church of Scientology v. City of Phoenix Police Dep't,* 122 Ariz. 338, 594 P.2d 1034 (App.1979). He asserts that the proper way to view all requests for information is not based on whether the document is "technically" a public record, but should focus instead on whether release of the information would have an important and harmful effect upon the official duties of the agency. We disagree. As the supreme court explained in *Griffis,* "[t]o apply a presumption of disclosure when a question exists as to the nature of the document is inappropriate: The initial inquiry must be whether the document is subject to the statute." 215 Ariz. at 5, ¶ 12, 156 P.3d at 422 (citing *Salt*

*River,* 168 Ariz. at 536, 815 P.2d at 905). Nothing in *Griffis* suggests that our supreme court intended to abandon the well-recognized definitions of a public record originally announced in *Mathews.*

7. The dissent, *infra* ¶ 54, contends that the metadata requested here should be viewed no differently than if a public officer kept a handwritten log book and noted the dates and times of any alterations or additions to the underlying public record. We are not persuaded by this analogy. First, the log book would qualify as a separate public record under the first or third *Mathews* definitions. Second, unlike a handwritten log book purposefully created by a public officer, metadata is information created by a computer.

able from the hard-copy of a particular document and such information is essential for authentication. He points to the current practice in federal courts that allows electronic evidence to be authenticated using metadata. Lake further notes that the federal courts now routinely allow parties to discover metadata. Based on these trends, he argues that it would be ironic if the courts were to disable Arizona's presumptively open records law by limiting its reach and denying the public the benefits of computerization. We do not question that metadata may contain valuable information, but we reject Lake's contention that electronic *evidence* is legally equivalent to a public record.

¶ 17 First, the presumption in favor of disclosure does not apply here because the information requested is not a public record. Second, Lake has not directed us to any authority suggesting that Arizona's public records law is co-extensive with evidentiary rules in a litigation context. Nor do we find any evidence of legislative intent to construe Arizona's public records law so broadly as to mean that if a document is discoverable in connection with a lawsuit, then it must also necessarily be disclosed by an agency under the public records law. *See Carlson,* 141 Ariz. at 489 n. 1, 687 P.2d at 1244 n. 1. (recognizing that "[w]hether something is a 'public record' in evidentiary terms is not necessarily co-extensive with those records available for public inspection under § 39–121.").

¶ 18 Third, the public records law supports a distinction between the metadata "records" that Lake sought to acquire and the "public records" that are accessible to the public. In construing a statute, we look first to the language of the statute. *See Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co.,* 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994). If the statutory language is unambiguous, we must give effect to the language and do not use other rules of statutory construction in its interpretation. *Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). "[A]bsent a clear indication of legislative intent to the contrary, we are reluctant to construe the words of a statute to mean something other than what they plainly state." *Canon,* 177 Ariz. at 529, 869 P.2d at 503.

¶ 19 The public records law provides in relevant part as follows:

B. All officers and public bodies shall maintain all *records,* including records as defined in § 41–1350, reasonably necessary or appropriate to maintain an accurate knowledge of their official activities and of any of their activities which are supported by monies from the state or any political subdivision of the state.

. . .

D. Subject to § 39–121.03:

1. Any person may request to examine or be furnished copies, printouts or photographs of any *public record* during regular office hours or may request that the custodian mail a copy of any public record not otherwise available on the public body's web site to the requesting person. . . .

A.R.S. § 39–121.01(B) and (D)(1) (emphasis added).[8]

¶ 20 Based on the plain language of the statute, public bodies have the duty to maintain all *records.* A member of the public, however, has the right to inspect or obtain a copy, printout, or photograph of *public* records. The legislature has broadly defined a "record" but has chosen not to define a "public record," notwithstanding that the public records law has been amended several times since our supreme court rendered the *Mathews* decision.[9] Thus, to date the legislature

---

8. A "record" is defined as: "*all* books, papers, maps, photographs or other documentary materials, *regardless of physical form or characteristics,* including prints or copies of such items produced or reproduced on film or electronic media . . . *made or received* by any governmental agency in pursuance of law or in connection with the transaction of public business and preserved or appropriate for preservation by the agency or its legitimate successor as evidence of the organiza-

tion, functions, policies, decisions, procedures, operations or other activities of the government, or because of the informational and historical value of data contained therein." A.R.S. § 41–1350 (2004) (emphasis added).

9. *Mathews* was decided in 1952. Since then, A.R.S. § 39–121.01, which now includes a subsection on definitions, was added by 1975 Ariz. Sess. Laws, Ch. 147, § 1; and was amended by

has deferred to the courts on this issue. *See Daou v. Harris*, 139 Ariz. 353, 357, 678 P.2d 934, 938 (1984) (applying presumption that the legislature knows of existing laws when it enacts or modifies a statute). Prior decisions of our supreme court have unambiguously recognized that not all documents found within the custody or possession of a public official are public records. *See, e.g., Griffis*, 215 Ariz. at 4, ¶ 11, 156 P.3d at 421; *Salt River*, 168 Ariz. at 538–39, 815 P.2d at 907–08. Accordingly, our supreme court has implicitly recognized the difference between a record and a public record; otherwise, applying the two-step analysis of *Griffis* and the definitions given in *Mathews* would be unnecessary because all materials, "regardless of physical form or characteristics," would be considered public records. We find that the legislature has not expressed an intention to treat "records" as coterminous with "public records." [10] *Cf. Primary Consultants, L.L.C. v. Maricopa County Recorder*, 210 Ariz. 393, 396 n. 2, ¶ 9, 111 P.3d 435, 438 n. 2 (App. 2005) (noting, without discussion, that public records includes all records).

■ ¶ 21 Our dissenting colleague questions the distinction we draw between records and public records, maintaining that because the electronic version of Conrad's notes is embedded within the metadata, it must be considered a public record. Physical location of the information, however, does not determine whether it meets the definition of a public record.[11] *See Salt River*, 168 Ariz. at 538, 815 P.2d at 907 ("It is the nature and purpose of the document, not the place where it is kept, which determines its status.") (quoting *Linder v. Eckard*, 261 Iowa 216, 152 N.W.2d 833, 835 (1967)). More importantly, the dissent's interpretation of the public records law fails to account for the legislature's decision to enact a specific definition of "record," but leave undefined the term "public record." [12]

■ ¶ 22 Addressing Lake's concern over the benefits of computerization, there is no question that computers serve vital functions for public bodies and the general public. But we must also recognize the practical reality that each time a government employee logs on or off of a computer, clicks a computer mouse, pushes the characters on a keyboard, sends an e-mail, prints a document, uses the internet, talks on a phone, or enters a building with keycard access, a "record" has arguably been generated. *See* A.R.S. § 41–1350. Thus, an enormous quantity of records, in numerous forms, is created each day in Arizona as a result of government operations. Simply because the records exist, however, does not mean that they fall, or necessarily should fall, within the definition of a public record. *Griffis*, 215 Ariz. at 4–5, ¶¶ 10–11, 156 P.3d at 421–22; *Salt River*, 168 Ariz. at 538–39, 815 P.2d at 907–08. If the legislature finds it appropri-

---

1976 Ariz. Sess. Laws, Ch. 104, § 17; 1977 Ariz. Sess. Laws, Ch. 54, § 2; and, most recently, 2000 Ariz. Sess. Laws, Ch. 88, § 54.

10. We acknowledge that the public records law creates some confusion on this point because the terms "record" and "public record" are not always carefully referenced. *Compare* A.R.S. § 39–121.01(C) ("Each public body shall be responsible for the preservation, maintenance and care of that body's *public records*.") (emphasis added) *with* A.R.S. § 39–121.01(B) ("All officers and public bodies shall maintain all *records* . . . ."). Nonetheless, we find the language of the statutes sufficiently plain to support our conclusion.

11. The dissent avoids the issue of whether "metadata embedded in a public record" must be produced as a matter of course. *See infra*, ¶ 57 n. 25. Doing so, however, creates an irreconcilable conflict with the notion that metadata is not an "electronic orphan." *Infra*, ¶ 53. If metadata

does not stand alone, then it would have to be produced every time a computerized public record is requested regardless of whether the requesting party has asked for metadata. For example, if a requesting party asks for a letter that was prepared on a computer by a public officer, all metadata must be disclosed because, according to the dissent's view, it is an inseparable component of the letter that was prepared by the officer. We do not view the public records law so expansively.

12. We also disagree with the dissent's position that *Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C.Cir.1993), provides useful guidance here. That case addressed the federal government's obligation to *preserve* electronic records under the Federal Records Act. *Id.* at 1277. The court did not address whether the "records" at issue, broadly defined in a manner similar to Arizona's definition, were "public records" under the Freedom of Information Act.

ate to declare that metadata falls within the scope of a public record, then the legislature may take the appropriate steps to make that change. Until such time, the public records law does not require the production of metadata in response to a public records request.

¶ 23 In sum, the metadata requested by Lake is not a public record. Thus, the presumption in favor of disclosure does not apply and the metadata is not subject to production under Arizona's public records law.[13]

### b. The Soha Request

■ ¶ 24 On June 23, 2006, Lake requested any aggravated assault or other police report listing Lieutenant Steve Soha as the victim during the year of 1989. Lake later narrowed the time frame of his request to March through May of 1989. The City advised Lake that it had searched its microfiche records and found no such report. Lake subsequently renewed his request, seeking all police reports listing Soha as either a suspect or victim from 1988 to present. The City informed Lake that it was unable to search its archives for such records because Lake had not identified the record he sought with sufficient specificity.

¶ 25 During informal discussions about this request and in his subsequent pleadings in the superior court, Lake suggested that the City could search for the requested records using the Police Automated Computer Entry ("PACE") system. PACE is the Phoenix Police Department's computer records management system that allows the police department to store criminal history information. PACE maintains all local criminal history information entered by the Phoenix Police Department and some information entered by surrounding municipalities. Additionally, PACE is linked to the Arizona Department of Public Safety's (the "Department") Criminal Justice Information System ("ACJIS") and the National Crime Information Center ("NCIC"), allowing retrieval of state and federal criminal history information.

¶ 26 Lake asserts that the superior court should have determined that the City's refusal to use PACE to access the Soha police reports was an improper denial of his request. Lake maintains that the City was obligated to search for the reports because he provided a specific ninety-day time frame involving a named victim in a stated location. The City counters that state law prohibits the use of PACE to obtain and disseminate information responsive to public records requests. More specifically, the City contends that because PACE is linked to ACJIS and NCIC, and Arizona law prohibits dissemination of criminal justice information from these systems to any unauthorized individual, the use of PACE to conduct a public records search is prohibited.[14] We reject this justification as a matter of law. A police report that is undisputedly a public record that would otherwise be subject to Arizona's public records law does not become immune from production simply by virtue of the method the City employs to catalogue the document.

¶ 27 Pursuant to A.R.S. § 41–1750 (2004 and Supp.2008), the Department maintains a statewide information system, ACJIS, for collecting, storing, and disseminating criminal history records and related criminal justice information. The Department is also responsible for limiting the dissemination of the records and information contained in ACJIS in pertinent part as follows:

1. Any criminal justice agency that obtains criminal justice information from the

---

**13.** Our research reveals only one reported decision addressing metadata as a public record. In *O'Neill v. City of Shoreline*, a Washington court considered whether specific metadata relating to an e-mail received by a city council member was a public record. 187 P.3d at 824, ¶ 1. The court determined that the metadata requested in that case fell within Washington's broad statutory definition of a public record. *Id.* at 826–27 & nn. 17–18, ¶¶ 14, 21 (citing Wash. Rev.Code Ann. § 42.56.010(2)-(3) (West 2008)) (defining a public record as any document, including "data compilations from which information may be obtained or translated," which contains "information relating to the conduct of government ... owned, used, or retained by any state or local agency *regardless of physical form or characteristics.*") (emphasis added). Thus, *O'Neill* is not helpful to our analysis here.

**14.** The City does not direct us to any specific authority governing the use of NCIC information and therefore we do not address it separately.

central state repository or through the Arizona criminal justice information system assumes responsibility for the security of the information and shall not secondarily disseminate this information to any individual or agency not authorized to receive this information directly from the central state repository or originating agency.

2. Dissemination to an authorized agency or individual may be accomplished by a criminal justice agency only if the dissemination is for criminal justice purposes in connection with the prescribed duties of the agency and not in violation of this section.

A.R.S. § 41–1750(Q)(1), (2).

¶ 28 Under subsection (1), the City, as a criminal justice agency, is prohibited from disseminating information from ACJIS directly to any individual, such as Lake, not authorized to receive the information from the originating agency. Lake, however, would be authorized to receive a police report from the City, as the originating agency, because the report constitutes a public record subject to disclosure by the City. Under subsection (2), the City may disseminate information from ACJIS for criminal justice purposes only if it falls within its prescribed duties. One of the City's duties, regardless of whether it is acting in the capacity of a criminal justice agency, is to comply with the public records law. Thus, based on these statutory provisions, we do not find that the legislature intended that public records stored in a computer database such as PACE become insulated from Arizona's public records law when they are transferred into the database.

¶ 29 The City cautions that if it is required to access information through PACE to produce records such as the Soha report, then every person would be entitled to use the system to check the criminal history of their families, neighbors, coworkers and any other individual when curiosity strikes. We do not suggest here that PACE is to be used for any purpose that is contrary to law. If the City has selected PACE as its database of choice for collecting and storing records, then it must also assume the responsibility of producing such records in response to record requests that comply with the public records law.

¶ 30 Finally, while the City correctly asserts that countervailing interests of confidentiality and privacy may defeat the production of certain public records, see Carlson, 141 Ariz. at 490–91, 687 P.2d at 1245–46, the City does not contend that such interests are implicated by the production of the Soha police reports sought by Lake in this case. See Phoenix Newspapers, Inc., v. Ellis, 215 Ariz. 268, 273, ¶ 22, 159 P.3d 578, 583 (App. 2007) ("It is incumbent upon the party arguing against disclosure to specifically demonstrate how production of the documents would violate rights of privacy or confidentiality, or would be detrimental to the best interests of the state.") (citation omitted).

¶ 31 We conclude that the City failed to meet its burden to show that the Soha police reports were not within the City's custody or control or were otherwise unavailable for production. Cox, 175 Ariz. at 14, 852 P.2d at 1198. Because the Soha police reports Lake requested were public records subject to production, the City wrongfully denied Lake access to those records.

### c. The Campbell E-mail Request

¶ 32 On March 24, 2006, Lake requested all e-mail between Commander Campbell, Soha, and Conrad concerning Lake from June 1, 2005 to March 24, 2006. The City responded to the request on April 11, 2006 by notifying Lake that Conrad did not have any e-mail concerning Lake. The City also informed Lake that the City was not the custodian for Campbell's and Soha's e-mail.

¶ 33 In fact, the City had been the custodian for Campbell's and Soha's e-mail until March 14, 2006, and August 15, 2005, respectively. In accordance with the City's records retention schedule, the City retains e-mail for thirty days. Thus, on March 24, 2006, when Lake made his request for Soha's e-mail records, Soha had long since been transferred to a citywide position and his e-mail relating to Lake, if any, had already been purged in compliance with the City's record

retention policy.[15] The City therefore did not deny Lake access to Soha's e-mail because it was not a public record within the City's custody when Lake made his request. *See* A.R.S. § 39–121.

¶34 Campbell's e-mail, however, falls in a different category. Because Campbell had left the City's e-mail system only ten days prior to Lake's March 24, 2006 request, the City retained approximately twenty days of Campbell's e-mails at the time of the request. The City admits that it should have produced any of those e-mails that concerned Lake to him in response to his March 24, 2006 request, but claims that the failure to produce the records was an "honest mistake."

¶35 The City admits that the requested documents were public records and does not assert that concerns regarding confidentiality, privacy, or the best interests of the state outweigh Arizona's policy in favor of disclosure. *See Griffis*, 215 Ariz. at 5, ¶13, 156 P.3d at 422. The City was required to produce the documents and its failure to do so was a wrongful denial of Lake's public records request.

#### d. The Jones Shooting Investigation

¶36 Lake also challenges the City's denial of his request for documents regarding an unfinished shooting investigation that occurred on December 9, 2005. The City acknowledges that it possessed records relating to an unfinished investigation of a shooting involving Officer Jones that occurred on December 9, 2005. The City asserts, however, that these records are not "public records" because a draft or unfinished report is not a public record within the meaning of

A.R.S. § 39–121.01(B), (C). We find the City's argument unpersuasive because our supreme court has made it clear that law enforcement agencies may not withhold public records pertaining to ongoing police investigations. *Cox*, 175 Ariz. at 14, 852 P.2d at 1198 (holding that "reports of ongoing police investigations are not generally exempt from our public records law" because such an exception would contravene Arizona's strong policy favoring open disclosure and access).

¶37 The documents encompassed by the Jones investigation request were public records subject to disclosure absent any argument that the records should have been protected from production because of concerns regarding confidentiality, privacy, or the best interests of the state. *See Griffis*, 215 Ariz. at 5, ¶13, 156 P.3d at 422. Thus, the City was required to produce the documents and its failure to do so was a wrongful denial of Lake's public records request.

### B. Attorney's Fees For Wrongful Denial

¶38 The City wrongfully refused to produce public records responsive to three of Lake's requests—the Soha request, the Campbell e-mail request, and the Jones investigation request. Pursuant to A.R.S. § 39–121.02(B), a court "may award attorney fees and other legal costs that are reasonably incurred in any action under this article if the person seeking public records has *substantially prevailed*."[16] (Emphasis added). Because we are reversing a portion of the superior court's decision, we remand to allow the court to determine whether Lake substantially prevailed in his special action and

---

**15.** The Phoenix Police Department is on a separate e-mail system from the rest of the City.

**16.** The legislature amended A.R.S. § 39–121.02 in May of 2006, without specifying an effective date. 2006 Ariz. Sess. Laws, Ch. 249, § 1 (2d Reg.Sess.) "An act with no specified effective date takes effect on the ninety-first day after the day on which the session of the legislature enacting adjourns sine die." *True v. Stewart*, 199 Ariz. 396, 397 n. 1, ¶3, 18 P.3d 707, 708 n. 1 (2001). The amendment was adopted in the second regular session of the forty-seventh legislature, which adjourned *sine die* on June 22, 2006. Thus, the statute became effective on September 21, 2006. Because Lake's special action was filed in De-

cember 2006, his request for fees is governed by the amended statute and therefore the proper inquiry is whether he has "substantially prevailed" in the action. *See Phoenix New Times*, 217 Ariz. at 537 n. 1, ¶6, 177 P.3d at 279 n. 1 (noting that based on the 2006 amendment, it is no longer necessary to show bad faith, or arbitrary or capricious conduct by the agency under A.R.S. § 39–121.02(B)); *Bouldin v. Turek*, 125 Ariz. 77, 78, 607 P.2d 954, 955 (1979) (holding that statutory provision governing attorney's fees in contract cases, A.R.S. § 12–341.01, did not apply to lawsuits commenced prior to effective date of statute).

is therefore entitled to an award of attorney's fees, including fees incurred on appeal.

## C. Failure to Promptly Produce Public Records

¶ 39 Finally, Lake argues that the records the City did produce in response to his requests were not produced promptly. "Access to a public record is deemed denied if a custodian fails to promptly respond to a request for production of a public record." A.R.S. § 39–121.01(E). Arizona law does not require that public records be furnished within a specific number of days after receipt of the request. Rather, in this context we have interpreted the word "prompt" to mean "quick to act" or to produce the requested records "without delay." *Phoenix New Times*, 217 Ariz. at 538, ¶ 14, 177 P.3d at 280 (citing *West Valley View, Inc., v. Maricopa County Sheriff's Office*, 216 Ariz. 225, 230, ¶ 21, 165 P.3d 203, 208 (App.2007)). We have also recognized, however, that whether a government agency's response to a wide variety of public records requests was sufficiently prompt "will ultimately be dependent upon the facts and circumstances of each request." *Id.* (quoting *West Valley View*, 216 Ariz. at 230 n. 8, ¶ 21, 165 P.3d at 208 n. 8).[17] We will uphold the superior court's discretionary decision unless it is clearly erroneous. *Cox*, 175 Ariz. at 14, 852 P.2d at 1198.

¶ 40 The City has the burden of establishing that its responses to Lake's requests were prompt given the circumstances surrounding each request. *See Phoenix New Times*, 217 Ariz. at 538–39, ¶ 15, 177 P.3d at 280–81. We therefore consider whether the City provided sufficient evidence to support the superior court's implicit decision that the City promptly responded to Lake's requests. We turn to the five specific matters Lake raises on appeal:[18]

(1) On March 24, 2006, Lake requested all notes kept by seven lieutenants documenting supervisory performance between January 1, 2005 and January 1, 2006. The City produced responsive documents on May 10, 2006.[19]

(2) On November 13, 2006, Lake requested reports of overtime usage under the Honor Guard index code beginning fiscal year 2003 through November 2006. The City produced responsive documents on January 10, 2007.

(3) On November 13, 2006, Lake requested all information legally permitted for release regarding Campbell, including his PMGs, PAP scores, and whether his PAP scores merited a pay increase, contained in the department and division files.[20] The City produced responsive documents on December 13, 2006 and January 10, 2007.

(4) On November 13, 2006, Lake requested any information legally permitted for

---

**17.** Thus, the authorities Lake cites regarding the time limits for compliance with a federal Freedom of Information Act request, or a prompt response to other state statutes, are of limited value. *See* 5 U.S.C. § 552(a)(6)(A)(i) (stating a federal agency has twenty days after the receipt of a FOIA request to determine whether to comply and to immediately notify the requestor of its determination); *Specht v. Finnegan*, 149 Ohio App.3d 201, 776 N.E.2d 564, 569 (2002) (holding that two month delay in response to public records request was not "prompt"); *Domestic Violence Servs. of Greater New Haven, Inc., v. Freedom of Information Comm'n*, 240 Conn. 1, 688 A.2d 314, 318 (1997) (holding that almost three month delay in responding to public records request was not "prompt"); *Vance v. Offices of Thurston County Comm'rs.*, 117 Wash.App. 660, 71 P.3d 680, 683 (2003) (statute required public agency to respond to public records request within five business days); *Derringer v. State*, 133 N.M. 721, 68 P.3d 961, 964 (Ct.App.2003) (statute required public bodies to respond within fifteen days to public records requests).

**18.** For reasons explained above, *supra* ¶ 5 n. 2, we decline to accept Lake's invitation to review the superior court record to determine whether the City failed to respond promptly to any of Lake's other requests.

**19.** Lake submitted a supplemental request on December 29, 2006, in which he clarified that he sought all of these Lieutenants' supervisory notes, and did not limit his request to notes relating to Lake, as the City had interpreted the request. The City produced responsive documents on January 9 and 18, 2007.

**20.** The parties do not define several acronyms used by Lake in his public records requests, including PAP and PMG. There is no dispute regarding which records Lake sought, and, from the context, we presume the acronyms refer to various Phoenix Police Department records.

release regarding Soha contained in the department and division files, including discipline history and PMGs. The City produced responsive documents on December 13, 2006 and January 10, 2007.

(5) On November 13, 2006, Lake requested all misconduct complaints or investigations and all documented PAS information, use of force reports, PMGs, supervisor notes and the contents of the department and division files for Officers Washburn, Hogan, Murphy and Jones. The City produced responsive documents on December 13, 2006 and January 10, 2007.

¶ 41 The City presented evidence to the superior court that the Phoenix Police Department's Records and Identification Bureau ("the Bureau") is the custodian of records for public records maintained within the entire Department, including those records maintained outside the Bureau. The Bureau has fourteen full-time employees who are responsible for responding to public records requests and, in fiscal year 2005–2006, the Bureau received approximately 53,000 public records requests.

¶ 42 The City argued that it had responded promptly to Lake's requests, many of which involved records covering extended periods of time that had to be retrieved from multiple persons, and produced 2,672 pages of responsive records. The City explained that because sixteen of Lake's eighteen public records requests sought records maintained within the Department, but outside of the Bureau, the Bureau was required to route the requests to the appropriate departments, divisions, and/or persons who maintain the records and await their retrieval and return. The City also offered evidence that the documents maintained outside the Bureau were reviewed by the Police Legal Unit prior to their production to ensure that they did not contain confidential information.

¶ 43 The City produced documents responsive to each of Lake's five requests at issue on appeal between thirty to fifty-eight days (twenty to thirty-three business days) after Lake submitted them. Given the broad nature of Lake's requests, which sought records maintained over several years and involving multiple persons, the City's uncontroverted evidence regarding the number of requests it receives each year, and the City's process for locating, reviewing, and producing responsive records, we determine that the evidence presented by the City is sufficient to support the trial court's decision.[21] We therefore find no abuse of discretion in the superior court's denial of Lake's request for an award of his costs and attorneys' fees under A.R.S. § 39–121.02(B) for Lake's claim that the City's production was not prompt.

## CONCLUSION

¶ 44 For the foregoing reasons, we affirm in part and reverse in part the superior court's determination. We remand with directions that the City promptly produce records responsive to the Jones investigation request and the Soha request. Additionally, the superior court shall determine whether Lake is entitled to an award of attorney's fees for the City's failure to produce these documents.

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge.

NORRIS, Judge, concurring in part, dissenting in part.

¶ 45 Although I join in the majority's resolution of Lake's public record requests concerning the Soha police reports, the Campbell e-mails, and the Jones shooting investigation records, I part company with its conclusion the metadata requested by Lake is not a public record. Focusing solely on the metadata, the majority reasons it is not a public record because it does not fit within any of the traditional public record formulations recognized by Arizona courts. *See supra* ¶ 12. Whether the metadata by itself fits within these formulations is not

---

**21.** As noted, the promptness of a response to a public records request must be evaluated based on the specific relevant facts. For example, if a records retention policy provides for destruction of certain records within a relatively short time period, such as the City's thirty-day e-mail retention policy, that factor should be taken into consideration when determining whether the public body responded promptly.

the question we should be asking; the question before us is whether the electronic version of Conrad's notes, which includes the metadata, is a public record. The answer to this question is "yes."

¶ 46 According to Lake—and not disputed by the City—Conrad created the notes on a city computer with "a Microsoft product." The information saved within this Microsoft product's electronic document file consisted of text—the words Conrad chose to reflect his thoughts about Lake—and other information, the metadata. What is important to understand is the metadata is part of the notes electronically created by Conrad; it is integral to the original electronic documents created by Conrad. Although, as the majority notes, Conrad did not independently create the metadata pursuant to any duty, law, or other obligation, and it was a "by-product" of his use of a computer, when he used a computer to document his dealings with Lake, the metadata became part of his notes just as did his words.[22]

¶ 47 A paper printout of an electronic document is not always the same as the electronic document. Metadata is part of an electronic document, but it generally cannot be viewed in a paper printout. See The Sedona Conference, *The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age,* at 80, *supra* ¶ 8. Thus, when an electronic document is printed on paper, part of the document, the metadata, is omitted. See *id.;* Philip J. Favro, *A New Frontier in Electronic Discovery: Preserving and Obtaining Metadata,* 13 B.U. J. Sci. & Tech. L. 1, 4 (2007). Here, the City has never argued, nor could it, that Conrad's notes are

not a public record. But, by producing only a paper printout, the City kept from public inspection the full content of his notes which are undisputedly public records. The metadata information omitted is as valuable as the text itself because this information can, as the majority correctly notes, "identify and certify the scope, authenticity, and integrity of active or archival electronic information or records." *See supra* ¶ 8. And, that is precisely why Lake wanted to see it. *See supra* ¶ 10.

¶ 48 In requesting the "specific file information contained inside the file" of Conrad's notes, Lake was asking to look at Conrad's notes in their electronic form.[23] Under our public records statute, barring issues of confidentiality and public safety—issues not presented here, a person asking to inspect a public record is entitled to inspect the real record. If we were dealing with a public record that began its "life" on paper, a person asking to see it would be entitled to see it—all of it. A person asking to see an electronic version of a public record should be treated no differently.[24]

¶ 49 In *Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1279, 1285 (D.C.Cir.1993), the court recognized paper printouts of electronic documents are not necessarily the same document. One issue before the court was whether various federal agencies were complying with their statutory obligations to preserve government records when they maintained only paper printouts of electronic communications, e-mails to be precise, instead of the electronic communications. *Id.* at 1277. Without using the term "metadata" the court explained the printouts

**22.** In responding to Lake's metadata request, the City stated Lake had asked for "a record that is not maintained by the Police Department and is unavailable." It also asserted the metadata was not a public record under *Mathews v. Pyle,* 75 Ariz. 76, 251 P.2d 893 (1952). The City did not and has never disputed, however, Lake's factual assertion that the metadata he requested was part of Conrad's electronic notes. Nor has the City ever asserted it could not produce an electronic version of Conrad's notes with the metadata.

**23.** Lake requested "'the meta data' or specific file information contained inside the file where

Lt. Robert Conrad documented notes on David Lake # 5055. This information should include the TRUE creation date, the access date, the access dates for each time it was accessed, including who accessed the file as well as print dates etc. A complete file history is requested."

**24.** An electronic document can be produced with its associated metadata. *See* Robert G. Schaffer and Anthony Austin, *New Arizona E–Discovery Rules,* Arizona Attorney, February 2008, at 24, 25 & 26 n. 6 (explaining that metadata can be produced in an electronic version of the printed document as a "native" file).

failed to include embedded information found only in the electronic communications. *Id.* at 1280. The court then stated:

> Our refusal to agree with the government that electronic records are merely "extra copies" of the paper versions amounts to far more than judicial nitpicking. Without the missing information, the paper print-outs—akin to traditional memoranda with the "to" and "from" cut off and even the "received" stamp pruned away—are dismembered documents indeed. Texts alone may be of quite limited utility to researchers and investigators studying the formulation and dissemination of significant policy initiatives at the highest reaches of our government.... [T]he practice of retaining only the amputated paper print-outs is flatly inconsistent with Congress' evident concern with preserving a *complete* record of government activity for historical and other uses.

*Id.* at 1285 (footnotes omitted).

¶ 50 What the court said in *Armstrong* is true here.

¶ 51 I agree with the majority that not every record created by a state agency or official is necessarily a "public record." *See* Ariz.Rev.Stat. ("A.R.S.") § 39–121.01(B) and (D)(1) (2001 and Supp.2008); *Griffis v. Pinal County,* 215 Ariz. 1, 2, ¶ 1, 156 P.3d 418, 419 (2007) (personal e-mails in government computer not necessarily public records); *Salt River Pima–Maricopa Indian Cmty. v. Rogers,* 168 Ariz. 531, 538, 815 P.2d 900, 907 (1991) (mere possession of document by public agency or official does not make it a public record). Otherwise, "a grocery list written by a government employee while at work, a communication to schedule a family dinner, or a child's report card stored in a desk drawer in a government employee's office would be subject to disclosure." *Griffis,* 215 Ariz. at 4, ¶ 11, 156 P.3d at 421. Thus, I also agree the "nature and purpose" of a document is crucial in determining whether a document is a public record. *Id.*

¶ 52 I cannot agree, however, that an electronic version of a "public record," as requested here, is not also a public record within the meaning of Arizona's public records law.

¶ 53 The majority's approach suggests metadata is somehow different from the underlying public record, and therefore, metadata has a different "nature and purpose" from the public record. This approach fails to recognize metadata is part of the requested electronic document. Suggesting metadata, standing alone, falls outside of the various formulations of a public record recognized in Arizona, misses the point—metadata does not stand alone. It is not an electronic orphan. It has a home; it exists as part of an electronic document. When, as here, that electronically created document is a public record, then so too is its metadata.

¶ 54 Even assuming the majority's premise that the metadata is somehow distinct from its underlying electronic public record, the metadata would, under the third *Mathews* test, *see supra* ¶ 12, still constitute a public record. As the majority notes, metadata records "the true creation date, the access date, the access dates for each time [the file] was accessed, including who accessed the file as well as print dates, etc." If an official recorded this information with a pen in a log book at the same time he or she created or altered the underlying public record, this information would certainly qualify as a "written record of transactions of a public officer in his office, which is a convenient and appropriate method of discharging his duties, and is kept by him as such, whether required by ... law or not." *See supra* ¶ 12. Simply put, just because the information is recorded electronically, its character as a public record does not change.

¶ 55 The purpose of the public records law is "to open *government* activity to public scrutiny." *Griffis,* 215 Ariz. at 4, ¶ 11, 156 P.3d at 421. Metadata contains information about who authored a document, when it was edited, and who would have accessed it. This information can be crucial to ensuring government transparency. *See Armstrong v. Executive Office of the President,* 810 F.Supp. 335, 341 n. 12 (D.D.C.1993) ("The question of what government officials knew and when they knew it has been a key question in not only the Iran–Contra investigations, but also in the Watergate matter."),

*aff'd in part, rev'd in part and remanded by* 1 F.3d 1274 (D.C.Cir.1993).

¶ 56 The electronic version of Conrad's notes, including the metadata, is precisely the type of information our public records law is meant to reveal. This electronic version identifies how and when the government acted. Specifically, it could reveal whether a government official "backdated" a public record. The requested electronic version of Conrad's notes sheds "light on how the government is conducting its business" and falls within the scope of Arizona's public records law. *See Griffis*, 215 Ariz. at 5, ¶ 12, 156 P.3d at 422.

¶ 57 With respect, I therefore dissent from the majority's conclusion the metadata requested by Lake was not a public record.[25] Accordingly, I would direct the superior court to require the City to produce Conrad's notes in their electronic form with their metadata and to determine whether Lake is entitled to an award of attorneys' fees because the City failed to produce those records.

25. As I have noted, Lake asked to inspect Conrad's electronically created notes in their entirety. *See supra* ¶ 48. Whether, without such specificity, a public agency must produce a copy of the electronic public record instead of a printout of that record as a matter of course in responding to a public records request is not before us.